1  HASSARD BONNINGTON LLP
   Philip S. Ward, Esq., SBN 51768
2  Joanna L. Storey, Esq., SBN 214952
   275 Battery Street, Suite 1600
3  San Francisco, California  94111-3370
   Telephone:  (415) 288-9800
4  Fax:  (415) 288-9801
   Email: psw@hassard.com
5        jls@hassard.com

6  Attorneys for Defendant
   GRAYBAR ELECTRIC COMPANY, INC. and
7  Third-Party Defendant GENERAL CABLE CORPORATION

8

9                UNITED STATES DISTRICT COURT

10             EASTERN DISTRICT OF CALIFORNIA

11  THE MOUNTAIN CLUB OWNER'S          Case No. 2:13-CV-01835-WBS-KJN
    ASSOCIATION,
12                                     **MEMORANDUM OF POINTS AND**
          Plaintiff,                   **AUTHORITIES IN SUPPORT OF**
13                                     **MOTION FOR SUMMARY**
    vs.                                **JUDGMENT BY DEFENDANT**
14                                     **GRAYBAR ELECTRIC COMPANY,**
    GRAYBAR ELECTRIC COMPANY, INC.,    **INC. AND THIRD-PARTY**
15                                     **DEFENDANT GENERAL CABLE**
          Defendant/Third-Party Plaintiff,  **CORPORATION [FRCP 56]**
16
    vs.                                DATE:        January 25, 2016
17                                     TIME:        1:30 p.m.
    GENERAL CABLE CORPORATION          COURTROOM:  5
18
          Third-Party Defendant.       TRIAL DATE:  March 8, 2016
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................ 1

II.   THE PLEADINGS ..................................................................................................... 2

III.  STATEMENT OF FACTS ........................................................................................ 2

      A.    The Fire ........................................................................................................... 3

      B.    Making Armored Cable ................................................................................. 3

      C.    The Cable in Unit No. 314 ........................................................................... 7

IV.   ARGUMENT ............................................................................................................. 7

      A.    Summary Judgment Standards ..................................................................... 11

      B.    Direct Evidence of Defect ............................................................................ 12

      C.    Circumstantial Evidence of Defect ............................................................. 13

V.    CONCLUSION ......................................................................................................... 18

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MSJ BY DEFENDANT GRAYBAR
AND THIRD PARTY DEFENDANT GCC, CASE NO. 2:13-CV-01835-WBS-KJN
P:\Wdocs\HBMAIN\02881\00002\00996254.DOC-122315

1

## TABLE OF AUTHORITIES

2

3                                                                          Page(s)

4                                    <u>Cases</u>

5    <u>Aguilar v. Atlantic Richfield Co.</u>,
         25 Cal.4[th] 826 (2001) ................................................................. 11
6
     <u>Barker v. Lull Engineering Co.</u>,
7        20 Cal.3d 413 (1978) .................................................................... 11

8    <u>Blank v. Coffin</u>,
         20 Cal.2d 457 (1942) .................................................................... 11
9
     <u>Celotex Corp. v. Catrett</u>,
10        477 U.S. 317 (1986) ...................................................................... 11

11   <u>Cronin v. J.B.E. Olson Corp.</u>,
         8 Cal.3d 121 (1972) ...................................................................... 12
12
     <u>Dimand v. Caterpillar Tractor Co.</u>,
13       65 Cal.App.3d 173 (1976) ............................................................. 12

14   <u>Garrett v. Howmedica Osteonics Corp.</u>,
         214 Cal.App.4[th] 173 (2013) .......................................................... 12
15
     <u>Herman Schwabe, Inc. v. United Shoe Machinery Corp.</u>,
16       297 F.2d 906 (2nd Cir.1962) ........................................................... 12

17   <u>Hinckley v. La Mesa Center, Inc.</u>,
         158 Cal.App.3d 630 (1984) ........................................... 13, 14, 15, 16
18
     <u>Matsushita Elec. Ind. Co. v. Zenith Radio Corp.</u>,
19       475 U.S. 574 (1986) ...................................................................... 11

20   <u>Moerer v. Ford Motor Co.</u>,
         57 Cal.App.3d 114 (1976) ............................................................. 13
21
     <u>Sargon Enterprises, Inc. v. University of Southern California</u>,
22       55 Cal.4[th] 747 (2012) ................................................................... 12

23   <u>T.W. Elec. Service, Inc. v. Pacific Elec. Contr. Assn.</u>,
         809 F.2d 626 (9th Cir. 1987)......................................................... 11
24
     <u>Triton Energy Corp. v. Square D Co.</u>,
25       68 F.3d 1216 (9th Cir. 1995)......................................................... 16

26                                   <u>Statutes</u>

27   Federal Rules of Civil Procedure 56(a) ........................................... 11

28

                                      -ii-

1

Other Authorities

2 CACI 1201 (2015) .................................................................................................. 12

3 Prosser, Law of Torts, §103 (4th ed. 1971) ....................................................... 14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-iii-

## I.   INTRODUCTION

This is a strict liability product action under California law.  Plaintiff Mountain Club Owner's Association ("Mountain Club" or "MCOA") alleges that a defectively manufactured electrical cable started a fire in 2011 that damaged Mountain Club's building in Kirkwood, California.  In its Second Amended Complaint, Mountain Club contends that the defective electrical cable was distributed and supplied by defendant Graybar Electric Co., Inc. ("Graybar").

In turn, Graybar filed a Third Party Complaint against General Cable Corporation ("General Cable" or "the Company") alleging that General Cable was the manufacturer of the electrical cable suspected of starting the 2011 fire.

Mountain Club's suit against Graybar, and Graybar's cross-action against General Cable, both turn on one dispositive issue:  whether the electrical cable removed from the fire debris was defectively manufactured.  More specifically, both actions turn on whether Mountain Club can prove that the insulation on the copper conductors inside the electrical cable was so inadequate that an electrical arc or fault started the fire.

Graybar and General Cable contend that, as a matter of law, Mountain Club cannot establish that the electrical cable at issue suffered from a manufacturing defect, never mind that factory-installed insulation was so inadequate, it caused a short that started the fire. Mountain Club's evidence that General Cable manufactured (and Graybar supplied) a badly insulated cable is wholly speculative and conjectural.  No reasonable jury could conclude that the electrical cable in the Kirkwood building was defectively manufactured, and other potential causes of the 2011 fire are far more likely than Mountain Club's claim that General Cable's armored cable had inadequate insulation on its conductors when it left the factory in 1999.

For that reason, summary judgment in favor of both moving parties is compelled by the settled factual record in this case.

////

-1-

## II.   THE PLEADINGS

On September 5, 2013, plaintiff The Mountain Club Owner's Association ("MCOA") filed a complaint alleging that defendant Graybar Electric Company, Inc. ("Graybar") distributed and supplied an electric cable that caused a fire in 2011 that damaged a MCOA building in Kirkwood, California ("the Building"). (Separate Statement of Undisputed Material Facts ("SUMF") No. 1).

In its complaint, MCOA set forth a strict product liability cause of action alleging that the electric cable supplied by Graybar was defective and that the defect caused the fire that damaged the Building. (SUMF No. 2). In its complaint, MCOA also alleged a negligence cause of action in which Graybar was accused of breaching a duty of care owed to MCOA by supplying a defective electric cable that caused the fire that damaged the Building. (SUMF No. 3).

Graybar filed a motion to dismiss MCOA's complaint, and this Court granted the motion on the ground that MCOA failed to plead sufficient facts to state either strict product liability or negligence claims. The Court granted leave to amend. (SUMF No. 4).

MCOA then filed a First Amended Complaint against Graybar in which it included two causes of action: one for strict product liability due to an alleged defectively manufactured cable and a parallel cause of action alleging negligence. (SUMF No. 5). In MCOA's strict liability count, it alleged that the cable supplied by Graybar lacked sufficient insulation on its copper conductors, resulting in an electrical arc that created heat sufficient to ignite nearby flammable materials which, in turn, damaged The Building. (SUMF No. 6). In its negligence count, MCOA alleged that the electric cable supplied by Graybar was negligently manufactured, leading to the fire that damaged The Building. (SUMF No. 7).

In response to a motion to dismiss the First Amended Complaint filed by Graybar, the Court found that by alleging the electric cable "lacked sufficient insulation on its electrical wiring," MCOA had stated a manufacturing defect claim. MCOA's negligence count, however, failed to adequately plead a failure to warn claim, and it was ordered dismissed. The Court granted leave to amend. (SUMF No. 8).

-2-

1    MCOA then filed a Second Amended Complaint against Graybar in which it

2  set forth a single count of strict product liability predicated on the claim that because the

3  electric cable was manufactured without sufficient insulation on its electrical wiring, it

4  allowed the conductors to come into contact, creating an electrical arc which set fire to nearby

5  flammable materials, resulting in damage to The Building.   (SUMF No. 9).  Graybar filed an

6  answer to the Second Amended Complaint.  (SUMF No. 10).

7    With leave of court, Graybar filed a Third-Party Complaint alleging that the

8  electrical cable it supplied for the construction of MCOA's building in Kirkwood, California

9  was manufactured by General Cable Corporation ("General Cable").  (SUMF No. 11). General

10  Cable answered Graybar's Third-Party Complaint.  (SUMF No. 12).

11   **III.    STATEMENT OF FACTS**

12      **A.    The Fire**

13    MCOA is the owner of the Building.  (SUMF No. 13).  The Building was

14  constructed in or around 1999.  (SUMF No. 14).  During the construction of the Building,

15  United Electrical Services, Inc. was the electrical wiring subcontractor.  (SUMF No. 15).

16  Graybar allegedly supplied the cable used by United Electrical Services, Inc. to wire the

17  Building and furnish it with electric power.  (SUMF No. 16).

18    More than eleven years after the Building was constructed and wired, on May

19  23, 2011 a fire occurred in the rafter space above Unit No. 314.  (SUMF No. 17).   The fire

20  allegedly damaged the Building to the tune of $6 million or more in repair and remediation

21  expenses. (SUMF No. 18).  The cause of the fire was investigated by the chief of the

22  Kirkwood Volunteer Fire Department, but the chief was unable to determine how or why it

23  started.  (SUMF No. 19).

24    The materials removed from Unit 314 after the fire included an electrical cable

25  connected to a chandelier lighting fixture that had been affixed to the ceiling in Unit No. 314.

26  (SUMF No. 20).  The electrical cable was connected to the chandelier inside a metal

27  "pancake" box located above the sheetrock ceiling of Unit No. 314.  (SUMF No. 21).  The

28  electrical cable connected to the chandelier in Unit No. 314 was a type of "armored" cable in

-3-

1  which three insulated copper wires were encased in an interlocked aluminum exterior jacket.

2  (SUMF No. 22).

3        The armored cable (and its interior three wires) was damaged as a result of the

4  fire. (SUMF No. 23).  The fire melted part of the exterior aluminum jacket near the pancake

5  box, and the insulation on the conductors was turned into carbon by the heat of the fire,

6  exposing the copper core inside each of the three wires.  (SUMF No. 24).

7        A length of armored cable, the pancake box, some charred wood from above

8  the Unit No. 314 ceiling and the chandelier fixture wire and chain were the only items

9  removed from the Building after the fire.  (SUMF No. 25).  When the length of armored cable

10  removed from Unit No. 314 after the fire was examined, it was determined that the

11  undamaged segment of the cable contained three insulated conductors, a surrounding plastic

12  sleeve and a marker tape identifying the cable as a MinuteMan® brand manufactured by

13  General Cable.  (SUMF No. 26).

14        Unit No. 314 was vacant on May 22, 2011. It was also vacant on May 23,

15  2011when the fire was discovered.  (SUMF No. 27).  Unit No. 314 had a circuit breaker box

16  installed in the kitchen wall, with the electrical lines connected to the panel in the box.

17  (SUMF No. 28).  After the fire, it was undetermined whether a circuit breaker connected to the

18  chandelier had "tripped" as a result of an arc or short in the chandelier wiring.  (SUMF No.

19  29).

20        Due to the heat of the fire, it is impossible to assess the condition of the

21  insulation on the electrical conductors within the armor as it was before the fire started.

22  (SUMF No. 30).

23        Unit No. 327 and Unit No. 314 were constructed and wired at the same time

24  and their layouts are virtually identical.  (SUMF No. 31).  When the original armored cable

25  connected to the chandelier in Unit No. 327 was removed and inspected, the insulated

26  conductors were inside a plastic sleeve.  Inside the armor, there also was a marker tape

27  identifying General Cable as its manufacturer.  (SUMF No. 32).  Further inspection of the

28  armored cable removed from Unit No. 327 showed that its insulation was intact, the insulation

-4-

1   appeared to comply with Underwriters Laboratories ("UL") standards, and there was no

2   evidence of any insulation defects or indications of arcing or faults in that wiring system.

3   (SUMF No. 33).

4           **B.**       **Making Armored Cable**

5          In the decade of the 1990s, General Cable manufactured scores of building wire

6   products, including MinuteMan® armored cable.  That product featured three insulated copper

7   conductors inside an interlocking aluminum jacket (SUMF No. 34).  In the mid-1990s,

8   General Cable partnered with a company named Alflex Corporation ("Alflex") so that General

9   Cable could utilize the superior proprietary armored jacketing process developed by Alflex.

10  General Cable manufactured and insulated the copper conductors after which Alflex encased

11  the conductors in its aluminum jacketing.  Alflex also added a plastic sleeve around the

12  conductors and an  interior marking tape identifying the cable as a General Cable

13  MinuteMan® product (SUMF Nos. 35 and 49).

14         General Cable began the MinuteMan® cable manufacturing process by

15  fabricating the internal copper conductors at the Company's plant in Watkinsville, Georgia.

16  Once the copper conductors were drawn to the requisite size, General Cable then applied

17  layers of polyvinyl chloride ("PVC") and nylon to insulate and protect the copper "wire"

18  (SUMF Nos. 36 and 37).  During this process, quality control measures were employed to

19  ensure that the copper conductors met UL standards.  If some wire did not measure up, it was

20  cut out of the manufacturing line (SUMF No. 38).

21         When the PVC layer was applied to the copper wire, the PVC coat was

22  continuously assessed to ensure it satisfied UL standards for dimensional tolerances (SUMF

23  Nos. 39 and 40).  Once the PVC coat was deemed up to standard (SUMF No. 41), the

24  insulated wire then had a coat of nylon applied which was also evaluated under applicable UL

25  standards (SUMF Nos. 42 and 43).  The completed insulated wire was then measured against

26  yet another governing UL standard (SUMF No. 44).

27         Finally, the insulated copper wire passed through a high frequency spark tester.

28  The wire was energized by 7,500 volts of electricity to identify breaks, pinholes and low

-5-

1   insulation properties of the wire.  Substandard wire, if any, was cut out in a later stage of the

2   production and discarded (SUMF 45).

3            Individual baskets of black, white and green-colored conductors were then

4   assembled for shipment to Alflex.  These conductors satisfied all governing UL and other

5   industry standards for electrical wire before being released from the General Cable factory

6   (SUMF Nos. 46 and 47).

7            In addition to General Cable's own quality control efforts, UL inspectors were

8   on site at the Watkinsville plant at least three times a week to conduct on-demand spot testing

9   of General Cable products utilizing the UL label, including the internal conductors that would

10  be incorporated into the MinuteMan® armored cable (SUMF No. 48).  These conductors were

11  continually tested for compliance with UL standards (Id.).

12           Alflex, in turn, received large stem packs of insulated wire from General Cable.

13  Among other armored cable products, General Cable's MinuteMan® brand cable utilized

14  three colored internal conductors:  one white, one green and one black (SUMF No. 50).

15           Alflex recognized the importance of the copper conductors being covered with

16  high quality insulation in order to prevent arcs or faults between conductors.  Alflex also

17  understood that once the conductors were encased inside the aluminum jacketing, the quality

18  of the insulation could no longer be easily assessed.  Accordingly, Alflex subjected the

19  General Cable conductors to tests throughout its manufacturing process to ensure that the joint

20  MinuteMan® product met all applicable UL standards (SUMF No. 51).

21           Therefore, Alflex initially connected the General Cable conductors to a spark

22  tester before the jacketing process even started.  Any wire which failed this spark test because

23  its insulation did not meet UL standards was cut out and discarded (SUMF No. 52).

24           Next, the conductors were coiled by another machine that again tested the

25  insulation for adequacy.  If any of the coils were substandard they were cut out and scrapped

26  (SUMF No. 53).

27           The coiled wires, all three of them, were then cabled together.  By the time the

28  three colored wires were cabled, the adequacy of the insulation had been check by Alflex four

-6-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MSJ BY DEFENDANT GRAYBAR
AND THIRD PARTY DEFENDANT GCC, CASE NO. 2:13-CV-01835-WBS-KJN
P:\Wdocs\HBMAIN\02881\00002\00996254.DOC-122315

1   separate times (SUMF No. 54).

2       The cabled wires then ran through Alflex's armoring machine where they

3   would be encased first in a plastic sleeve and then by the interlocking aluminum jacket itself.

4   The marker tape was also added at this step in the manufacturing process.  Throughout the

5   jacketing process, the cabled wire was grounded to the machine and a current run through it to

6   see if there were any cracks or openings in the insulation.  Substandard cable was discarded

7   (SUMF No. 55).

8       Once the armor was applied, the cable would be coiled and run through another

9   spark tester before it was shipped out to General Cable warehouses and/or distributors

10  (SSUMF No. 56).

11      In addition to numerous spark tests of the armored cable, Alflex employed

12  quality inspectors to protect its right to use the UL label.  For its part, UL sent inspectors to the

13  Alflex facility several times a month to conduct its own destructive testing of these armored

14  cable products to ensure UL standards were being met (SUMF Nos. 57, 58, 59 and 60).  Alflex

15  never lost its UL certification authority (Id.).

16      C.      The Cable in Unit No. 314

17      Upon examination of the bare copper wires removed from the Building, a

18  portion of the conductors were melted and arc-molded along adjacent surfaces between

19  conductors.  This erosion is characteristic of "arcing through char."  (SUMF No. 61).  When a

20  wood fire occurs in the vicinity of insulated electrical wires, the PVC insulation on the wire

21  can melt and leave a brittle carbon char that is electrically conductive. (SUMF No. 62).  The

22  carbon char provides a pathway for electrical arcing between conductors, creating

23  temperatures above the melting point of copper that can cause the kind of flattened surfaces

24  observed on the adjacent conductors in the cable removed from above Unit No. 314. (SUMF

25  No. 63).  In the absence of fire, in order for an insulation-related defect to create an arc or fault

26  between conductors inside the armored jacket, it would require non-compliant insulation on at

27  least two of the three conductors, with the insulation defects aligned both axially and

28  circumferentially, and in extremely close proximity for eleven years, without contact.  If that

1    type of defect occurred during the manufacturing process, it would be expected to manifest

2    itself as an arc soon after the cable was put into service and energized. (SUMF No. 64). In

3    the situation of the 2011 fire in the Building, an arc or fault in the conductors would need a

4    path to exit the cable assembly. As noted above, the armoring could have been damaged

5    during installation (e.g. pierced by a nail or staple) or sometime during the eleven years

6    between installation and the fire. Absent that kind of mechanical pathway, the fault would

7    need to persist and to be of such intensity to both overheat and/or melt the aluminum jacketing

8    and set fire to adjacent wood or other combustible material above the ceiling. (SUMF No.

9    65).

10        The likelihood of a series arc occurring simultaneously with a break in the

11    aluminum armor, more than eleven years after the cable went into service, is so small as to be

12    unquantifiable. (SUMF No. 66). The probability of the May 23, 2011 fire having started

13    independently of the armored cable, or as a product of installation error or simply the passage

14    of time, is orders of magnitude greater than the chance the insulation on the conductors was

15    defectively manufactured before the cable left the factory, leading to a fault over eleven years

16    after manufacture. (SUMF No. 67).

17        The round electrical enclosure used to contain the circuit wiring supplying

18    power to the chandelier fixture in Unit No. 314 was a "pancake" box by appearance,

19    approximately four inches in diameter and one-half inch in depth. In the electrical industry,

20    those dimensions produce an interior volume of six cubic inches. (SUMF No. 68). In the

21    pancake box above the ceiling in Unit No. 314, there were two 12 AWG ("12 American Wire

22    Gauge") circuit conductors, a 12 AWG equipment grounding conductor and a fixture stud, all

23    of which must be accounted for in the volume fill calculation required by the National

24    Electrical Code ("NEC"), the national and industry standard for installations involving

25    electricity. (SUMF No. 69). In accordance with NEC Table 314.16(B), each of these

26    conductors and components requires a minimum of 2.25 cubic inches of volume or, in total,

27    nine cubic inches of room in the box. (SUMF No. 70).

28    ////

1    Since the volume of the pancake box was only six cubic inches this would have

2    forced the conductors (consisting of solid core copper with limited flexibility) to be bent at

3    sharp angles, with the conductors being in close proximity to or in contact with the threaded

4    metal fixture stud in the center of the box.  (SUMF No. 71).  The contact between the

5    conductors and metal inside the box could result in pinching of the conductors and pressure on

6    the insulation covering them.  (SUMF No. 72).

7    Over the eleven or more years between the connections being made in the

8    pancake box (1999) and the subject fire (2011), friction could occur between the metal threads

9    of the fixture stud and the insulation on the conductors due to, for example, heating and

10   cooling (expansion and contraction) or the movement of the hanging light fixture causing

11   movement of the wiring. (SUMF No. 73).  With more than a decade of these forces applied to

12   the connections in the pancake box, there could well have been a penetration of the insulation

13   on one or more conductors, allowing direct metal to metal contact between the energized

14   conductor and the fixture stud, thereby energizing the stud itself, the metal box, the metal

15   hanger attaching the box to the wood building structure, even the nails or screws securing the

16   box to the hanger.  Any contact between an uninsulated conductor and a normally non-current

17   carrying metal surface could have resulted in an arc or electrical fault.  (SUMF No. 74).

18   During the September 29, 2015 inspection of Unit No. 327, a length of armored

19   cable from above the unit's ceiling was removed.  It had been connected with the fixture wire

20   from a hanging chandelier that looked identical to the one removed from Unit No. 314 after

21   the fire.  (SUMF No. 75).  Instead of using a pancake box, however, the chandelier

22   connections in Unit No. 327 were made inside a "four square box" which had considerably

23   more interior volume than the pancake box.  (SUMF No. 76).

24   The contractor assisting in the September 2015 inspection also removed a

25   length of armored cable that connected two plug receptacles above the baseboard in the living

26   room of Unit No. 327.  Inspection of one of the plug receptacles showed evidence of electrical

27   arcing, indicating below-standard workmanship on the wiring.  Photographs from an earlier

28   inspection of Unit No. 327 showed that the cable connecting the chandelier to the wall switch

-9-

1   in the unit's kitchen was not secured as required by the NEC, further indications of poor

2   workmanship. (SUMF No. 77). The conditions shown in Unit No. 327 suggest that one

3   would have to consider that the workmanship in the electrical connections in Unit No. 314

4   could also have been below standard, resulting in damage to the insulation on the conductors

5   that, over time, eventually led to an arc or fault in the ceiling area of that unit. (SUMF No.

6   78).

7             Based on photographs taken in Unit 314 after the fire, the ceiling fan and the

8   chandelier were similarly installed (pancake box and hanger). Based on the presence of two

9   rows of nails at different depths, it appears that there were two layers of sheetrock installed,

10  each approximately 5/8" thick. The hanger supporting the ceiling fan pancake box is not flush

11  with the bottom of the ceiling joists, resulting in a setback of over 1" for the pancake box. The

12  hanger for the pancake box used for the chandelier light fixture also does not appear to have

13  been installed flush with the bottom of the ceiling joists, resulting in a similar setback.

14  (SUMF No. 79). The 1996 NEC required that "Any combustible wall or ceiling finish

15  exposed between the edge of a fixture canopy or pan and an outlet box shall be covered with

16  noncombustible material." There is no evidence of any noncombustible material being

17  installed over the exposed wood or sheetrock for either the chandelier light fixture or the

18  ceiling fan in Unit 314, resulting in a code violation and potential for combustion. Photos from

19  Unit 327 show a four-square box used for the chandelier fixtures with a special cover attached

20  to the box to maintain protection from combustible surfaces extending through the sheetrock

21  assembly. (SUMF No. 80).

22            Since 1992, General Cable has not been a party to a lawsuit, or named in a

23  subrogation action, in which any of its MinuteMan® Aluminum MC armored cable products

24  was alleged to suffer from a defect -- whether the alleged defect purportedly occurred during

25  the manufacturing process or as a result of the design of the product. (SUMF No. 81).

26  ////

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MSJ BY DEFENDANT GRAYBAR
AND THIRD PARTY DEFENDANT GCC, CASE NO. 2:13-CV-01835-WBS-KJN
P:\Wdocs\HBMAIN\02881\00002\00996254.DOC-122315

## IV.   ARGUMENT

### A.   Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact, and it can satisfy its burden by presenting evidence that negates an essential element of the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).  Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial.  Ibid.

While the court is obligated to view the facts and draw inferences therefrom in favor the non-moving party (T.W. Elec. Service, Inc. v. Pacific Elec. Contr. Assn., 809 F.2d 626, 631 (9th Cir. 1987)), the party opposing the motion for summary judgment must establish a "genuine" factual dispute which involves "more than … some metaphysical doubt as to the material facts…." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In Aguilar v. Atlantic Richfield Co., 25 Cal.4[th] 826 (2001), the California Supreme Court analyzed the governing law on summary judgment under both state statute and Rule 56.  The Court held that if a defendant moves for summary judgment, and the evidence offered by the plaintiff shows the existence of a critical element of its claim only *as likely* or even *less likely* than the nonexistence of that element, the court must grant the defendant's motion because a reasonable trier of fact could not find for the plaintiff in such a case.  Id., 25 Cal.4[th] at 857, and footnote 27.  Whether a particular inference can be drawn from certain evidence is a question of law for the court. Blank v. Coffin, 20 Cal.2d 457, 461 (1942).

In this case, Mountain Club has pleaded a product defect claim based on an alleged manufacturing defect in the armored cable connected to the hanging light fixture in Unit No. 314 (SUMF No. 9).  Such a claim assumes that the product was adequately designed but that the product at issue materially differed from that design.  Barker v. Lull Engineering Co., 20 Cal.3d 413, 429 (1978); see Garrett v. Howmedica Osteonics Corp., 214 Cal.App.4[th]

-11-

1    173, 190 (2013) ("[A] product has a manufacturing defect if the product as manufactured does

2    not conform to the manufacturer's design.")  The product must be shown to have been in a

3    defective condition when it left the manufacturer's possession and that the defect was a

4    substantial factor in causing the plaintiff's damage.  CACI 1201 (2015); Cronin v. J.B.E.

5    Olson Corp., 8 Cal.3d 121, 133 (1972).

6           Evidence of a manufacturing defect can be either direct or circumstantial.

7    Dimand v. Caterpillar Tractor Co., 65 Cal.App.3d 173, 183 (1976).  If the non-moving party

8    relies on expert testimony to establish the existence of a manufacturing defect, that expert

9    opinion cannot be based on assumptions of fact that do not have support in admissible

10   evidence.  Such opinions are only as good as the facts and reasoning upon which they are

11   based.  Expert opinion resting on guess, surmise or conjecture should be disregarded.  Sargon

12   Enterprises, Inc. v. University of Southern California, 55 Cal.4th 747, 770 (2012), citing

13   Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2nd Cir.1962).

14          As General Cable will demonstrate below, the jury would have to speculate or,

15   metaphorically, flip a coin to conclude that the insulation on the conductors inside the armored

16   jacket of the subject electrical cable deviated from the intended manufacturing design when

17   that product left the factory in 1999.  Equally speculative would be an inference that because a

18   fire occurred above the ceiling in Unit No. 314 in 2011, defective insulation caused a fault that

19   somehow penetrated the plastic sleeve surrounding the conductors, exited or melted the

20   aluminum jacket and lasted long enough to set fire to the Building's wooden ceiling joists

21   before the unit's circuit breaker tripped and cut off the power.  Simply put, the Court should

22   hold that the material facts in this case are indeed undisputed and that inferences critical to

23   Mountain Club's single cause of action cannot be drawn from those undisputed material facts.

24          **B.    Direct Evidence of Defect**

25          In its Separate Statement, General Cable established the procedures and

26   standards which were followed in the manufacturing process of its armored cable in late 1998

27   and 1999 at the Watkinsville, Georgia plant (SUMF Nos. 36-48).  That evidence shows that

28   the millions upon millions of feet of conductors being produced at that plant complied with

-12-

1  industry standards, including those set by UL, with respect to the conductors' copper core and

2  the insulation (PVC) and protective covering (nylon) applied to it.

3          If that were not enough, the Separate Statement also establishes that Alflex

4  conducted a series of quality assurance tests on the individual conductors it received from

5  General Cable to ensure that the insulation inside its aluminum jacketing complied with all

6  industry standards and the separate requirements of UL (SUMF Nos. 50-56).  By the time

7  Alflex shipped completed armored cable to General Cable's distributors, the thickness of the

8  insulation on the now-cabled and jacketed conductors had been measured on two separate

9  occasions (SUMF Nos. 39-44) and its sufficiency had been machine-assessed by both the

10  Watkinsville staff (SUMF 45) and on six different occasions by Alflex personnel (SUMF

11  Nos. 52-56). On top of these efforts by the manufacturers, UL had its own inspectors at both

12  plants charged with the responsibility of preventing non-conforming cable from being shipped

13  (SUMF Nos. 48 and 57-60).

14          These quality assurance procedures followed by both General Cable and UL

15  leave no room for an inference that the conductors in the armored cable above the ceiling in

16  Unit No. 314 lacked sufficient insulation when they left the Watkinsville plant in 1999.

17          As for the specific length of armored cable connected to the hanging light

18  fixture in Unit No. 314, the fire significantly damaged the cable and the three conductors

19  inside it (SUMF Nos. 23, 24 and 30).  See also Exhibit 19, at KDF000100 ("The wiring on the

20  ceiling side was mostly burned away during the fire and could not be inspected").  As a

21  consequence, no direct evidence exists that the insulation applied to the conductors, which the

22  fire turned into carbon char (SUMF No. 24), was inadequate or deviated from industry and UL

23  standards when it went to market in 1999.

24          **C.    Circumstantial Evidence of Defect**

25          As the California Court of Appeals explained in Hinckley v. La Mesa Center,

26  Inc., a defect in a product cannot be inferred merely from an accident, such as, in this case, a

27  fire.  158 Cal.App.3d 630, 642 (1984).  See, also, Moerer v. Ford Motor Co., 57 Cal.App.3d

28  114 (1976) (evidence that auto's tie rod separated 33 months after delivery of car to plaintiff

-13-

1  cannot establish defective manufacture).  Rather, to prove a defect by circumstantial evidence,

2  the plaintiff generally must satisfy three elements (1) the accident occurred shortly after sale

3  of the product; (2) the plaintiff (including third parties) did nothing to cause the accident; and

4  (3) expert testimony suggests a defect was responsible for the accident.  Ibid.  Quoting

5  Prosser, Law of Torts, the court in Hinckley elaborated:

6          The mere fact of an accident, standing alone, as where an
         automobile goes into the ditch, does not make out a case that the
7          product was defective, nor does the fact that it was found in a
         defective condition after the event, where it appears equally
8          likely that it was caused by the accident itself.  But the addition
         of other facts tending to show that the defect existed before the
9          accident, such as its occurrence within a short time after sale, or
         proof of the malfunction of a part for which the manufacturer
10         alone could be responsible, may make out a sufficient case, and
         so may expert testimony.  So likewise may elimination of other
11         likely causes by satisfactory evidence.

12  Id., at 643 (quoting Prosser, Law of Torts, at §103 (4th ed. 1971)).

13         Applying the foregoing principles, in Hinckley the court found sufficient

14  circumstantial evidence to submit plaintiff's manufacturing defect claim to the jury.  Id., at

15  643.  After two separate fires in the engine compartment of his motorhome within one year of

16  purchase (the second of which completely destroyed the vehicle), the plaintiff in Hinckley

17  filed suit against the manufacturer claiming electrical wiring in the hood was defectively

18  manufactured and/or designed.  "[T]he complete destruction of the motorhome precluded any

19  direct determination the fire was caused by a specific defect in the electrical wiring."  Ibid.  At

20  trial, plaintiff's expert testified that the "strongest" probability was that defectively

21  manufactured wiring in the engine compartment caused the fire.  Id., at 638.  The expert

22  excluded an alternative cause—a leak in the hydraulic system—by pointing out that plaintiff

23  inspected the engine shortly before the fire and did not observe a leak.  The appellate court

24  ultimately held that sufficient circumstantial evidence existed to submit the manufacturing

25  defect claim to the jury based on the following facts:

26          . . . (1) the earlier Calexico fire began in the same locale as the
         Utah fire, (2) [Plaintiff's expert] testified the first and second
27          fires were interrelated; (3) [Plaintiff's expert] considered an
         electrical problem the most probable cause of the fire, (4) two
28          fires furnished circumstantial evidence from which the jury

-14-

1    could determine an electrical defect caused the fire, and (5) trial
2    testimony eliminated other likely causes of the fire...

3        The facts of the instant action are dramatically different than those which the

4    court found warranted jury resolution in Hinkley.  First, the armored cable removed from Unit

5    No. 314 had been manufactured in and around 1999, when Graybar purportedly supplied it to

6    MCOA's electrical contractor (SUMF Nos. 1 and 11).  The fire occurred in 2011, over eleven

7    years later.  In virtually all circumstances, defectively insulated conductors would arc and

8    short out almost immediately upon being energized for the first time, not after over eleven

9    years of operation (SUMF No. 65).

10        Second, as the undisputed facts establish unequivocally, the electrical

11    connections above the ceiling in Unit No. 314 were made in an inadequate receptacle, the use

12    of which violated the National Electrical Code.  Unlike the "four square" box used in Unit

13    No. 327, the "pancake" box in Unit No. 314 forced the three conductors (and the lighting

14    fixture wires) into a very tight space which threatened to compromise their insulation through

15    friction, vibration, expansion and contraction.  The likelihood that two of the three conductors

16    in this particular length of cable each had closely-aligned bare or inadequate insulation when

17    the cable was shipped back in 1999 is remote enough.  But it becomes measurably more

18    remote when compared to the likelihood that the chandelier connections crammed into an

19    inadequate receptacle for over eleven years eventually arced with enough heat to ignite nearby

20    flammable materials.

21        Third, the "flattened" surface of the conductors observed after the fire is

22    explained not by an arc *starting* a fire but by an arc *caused* by the fire.  It is undisputed that

23    the fire burned away all the PVC insulation (and the nylon too), allowing energized

24    conductors to "arc through char" across the intervening space.  The most likely scenario is that

25    this arcing occurred as a result of an already working fire.

26        Fourth, even if one assumes for argument's sake that in 2011 the insulation on

27    the armored cable conductors above the ceiling in Unit No. 314 was too thin, or completely

28    absent, it would be pure speculation to conclude that the insulation was in that condition when

-15-

1   it left the factory back in 1999.  During a period of in excess of eleven years, the insulation

2   could have been damaged by negligent installation (of which there is ample evidence in both

3   Unit Nos. 314 and 327), the deleterious effects of the "pancake" box, expansion/contraction

4   due to extreme temperature changes in the Sierra, construction of the new snow melt system in

5   2010 or misuse of the light fixture connected to the cable.

6           Thus, in <u>Triton Energy Corp. v. Square D Co.</u>, 68 F.3d 1216 (9th Cir. 1995), a

7   fire occurred in plaintiff's facility over thirty years after it had been outfitted with Square D-

8   manufactured circuit breakers.  Plaintiff, however, inspected the wrong circuit breaker and

9   allowed the breaker potentially involved in the fire to be junked. Square D moved for

10  summary judgment, contending that the plaintiff could not establish that the junked breaker

11  had been defective when it had left Square D's possession over thirty years before.  The

12  District Court granted the motion, and the Ninth Circuit affirmed.  <u>Id.</u>, at 1222.

13          In doing so, the Court of Appeals held that:

14          To succeed before the jury, [the plaintiff] must establish by a
            preponderance of the evidence that a circuit breaker, not in
15          evidence, was shipped from the Square D plant more than two
            decades ago in a defective condition. At best its evidence merely
16          suggests this is a weak possibility.

17                          *   *   *

18          Square D, in seeking summary judgment, only has to show that
            Triton cannot establish an element of its case – that the circuit
19          breaker was defective when it passed to the hands of a purchaser
            many years ago.  [Plaintiff] simply failed to present sufficient
20          probative evidence that would require a jury decision. <u>Id.</u>, at
            1221-1222.
21

22          Moreover, unlike the circumstances in <u>Hinkley</u>, there are a number of possible

23  causes of the fire that appear far more likely than MCOA's claim that (1) the insulation on the

24  conductors inside General Cable's armored cable was inadequate when it left the factory back

25  in 1999 and (2) this manufacturing defect was a substantial factor in causing the 2011 fire.

26  The first is the use of the pancake box in violation of governing provisions of the NEC and its

27  effect on the integrity of the insulation.  The second is simple installation error by the

28  electrical contractor, for which there is evidence in both inspected units in the Building.  And

-16-

1 | third, the NEC was violated when the too-shallow pancake box was used in a ceiling over one

2 | inch in thickness, exposing any flammable materials in the area to heat or flame that should

3 | have been confined within a proper receptacle like the four-square box in Unit No. 327

4 | (SUMF Nos. 79-80).

5 | Finally, the inadequacies of the pancake box resulted in fixture wire extending

6 | outside the medal edge of the box.  Photographs taken after the fire, presumably by MCOA

7 | agents, show that there was an arc fault on the fixture wire that would have been very close to

8 | the paper backing on the rolls of fiberglass insulation laid between the rafters and on top of the

9 | pancake box and very close to the wooden joist to which the box was attached.  This is likely

10 | the cause of ignition above Unit No. 314.  Or it is at least as likely a fire-cause scenario as the

11 | one offered by MCOA which requires a catastrophic failure of a cable that worked without

12 | incident for over eleven years after manufacture and installation.

13 | Finally, there is no evidence that anyone has ever asserted a claim of defective

14 | manufacture or defective design in connection with any of the MinuteMan® Aluminum MC

15 | armored cable products made by General Cable (SUMF No. 81).

16 | The importance of the "substantial factor" causation element of Mountain

17 | Club's single cause of action cannot be overlooked.  As mentioned above, Mountain Club has

18 | to offer admissible evidence sufficient to explain how and why defective insulation on at least

19 | two of the three conductors in the armored cable above the ceiling in Unit No. 314 was close

20 | enough to cause an arc or fault in 2011 that somehow went through or around the plastic

21 | sleeve and aluminum armor and ignited flammable materials in the rafter space above the

22 | sheet rock ceiling – all before the arc tripped the circuit breaker and cut off the power

23 | necessary to maintain the fault (SUMF Nos. 64-67).

24 | In fact, Mountain Club cannot even establish that the circuit breaker in Unit

25 | No. 314 operated correctly – that it did what it was designed to do on May 23, 2011 by

26 | tripping due to a circuit overload so as to cut off further power to the hanging light fixture.

27 | Either no one inspected the breaker box after the fire or it was altered by the fire suppression

28 | effort (SUMF Nos. 28 and 29).  In either case, how this fire started remains today as much of a

-17-

1    mystery as it was when the fire department chief inspected it back in 2011.

2    **V.    CONCLUSION**

3    The undisputed facts in this case do not establish, more likely than not, that

4    General Cable manufactured a defective armored cable product back in 1999 that failed in

5    2011 after over eleven years of satisfactory service. The only way Mountain Club can even

6    attempt to carry its evidentiary burden in this case is by constructing a hypothesis that depends

7    upon the layering of unsupported assumption upon assumption – a hypothesis that raises more

8    questions than it answers.

9    Based on the undisputed evidence offered in support of this motion, no

10   reasonable jury could find in Mountain Club's favor without engaging in the rankest of

11   speculation and guesswork. What was the condition of the insulation on the conductors in the

12   armored cable above the ceiling in Unit No. 314 in 1999? No one knows. What forces

13   operated on the conductors and their insulation during the almost twelve years between 1999

14   and 2011? Your guess is as good as mine. How well (or badly) were the connections made

15   between the chandelier, the armored cable and the fixture wire back in 1999? Most likely, that

16   was not good work. Why was the pancake box used in Unit No. 314 instead of a receptacle

17   with the required interior volume as was used in Unit No. 327? One can only reply that the

18   use of the pancake box clearly compromised the safety of the system in that unit. Is there a

19   plausible explanation for how an armored cable defectively manufactured in 1999 could have

20   faulted for long enough in 2011 to ignite wood trusses without the circuit breaker tripping and

21   cutting off the power? Mountain Club lacks any evidence to respond to these and all the other

22   points discussed over the course of this memorandum.

23   For these reasons, this Court should conclude that no reasonable jury could

24   make the findings necessary to support Mountain Club's defective manufacture cause of

25   action. Mountain Club's case at best suggests weak possibilities concerning the condition of

26   General Cable's armored cable product when it left the Company's possession in 1999. Those

27   possibilities, however, do not state a jury question. For that reason, this claim should be

28   summarily resolved in favor of defendant Graybar (as distributor) and Third Party Defendant

-18-

1    General Cable Corporation (as manufacturer).  Both moving parties pray for entry of judgment

2    in their favor as a matter of law.

3    Dated:  December 23, 2015                    HASSARD BONNINGTON LLP

4

5                                                 _____/ s / Philip S. Ward_____
                                                  Philip S. Ward

6                                                 Attorneys for Defendant GRAYBAR ELECTRIC
                                                  COMPANY, INC. and Third-Party Defendant

7                                                 GENERAL CABLE CORPORATION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MSJ BY DEFENDANT GRAYBAR
AND THIRD PARTY DEFENDANT GCC, CASE NO. 2:13-CV-01835-WBS-KJN
P:\Wdocs\HBMAIN\02881\00002\00996254.DOC-122315